[ORAL ARGUMENT NOT YET SCHEDULED]

No. 20-1520

IN THE UNITED STATES COURT OF APPEALS
FOR THE D.C. CIRCUIT

ARCHER WESTERN CONTRACTORS, LLC,
Petitioner,

v.

U.S. DEPARTMENT OF TRANSPORTATION
and FEDERAL AVIATION ADMINISTRATION,
Respondents.

On Petition For Review Of Order
Of The Federal Aviation Administration 15-ODRA-00725, -00735

**INITIAL BRIEF FOR RESPONDENTS**

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

PATRICIA M. MCCARTHY
Assistant Director

CORINNE A. NIOSI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel:  (202) 616-0391
Email:  Corinne.A.Niosi@usdoj.gov
Attorneys for Respondents

August 10, 2021

## CERTIFICATE AS TO PARTIES,
## RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a), Respondent, the Federal Aviation Administration (FAA) certifies as follows:

**1. Parties and Amici**. All parties, intervenors, and amici appearing before the Office of Dispute Resolution for Acquisition (ODRA) in ODRA Docket Nos. 15-ODRA-00727 and -00735 and in this Court are listed in the certificate as to parties, rulings, and related cases in the brief of petitioner, Archer Western Contractors, LLC (Archer).

**2. Rulings Under Review**.  All references to the rulings at issue appear in the brief of petitioner, Archer.

**3. Related Cases.**   This case has not previously come before this Court, or any other court.  The FAA is not aware of any other related cases in this Court or any other court.

i

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..........................................................1

COUNTER-STATEMENT OF THE ISSUES ........................................2

STATUTES AND REGULATIONS.......................................................3

STATEMENT OF THE CASE................................................................3

    I.    Nature Of The Case And Course Of Agency Proceedings ......................3

    II.    Contract Overview................................................................5

    III.    Archer's Stop Work And Performance Delays In Response To The FAA's Proposed Contract Claim 16, Item 10 .............................5

    IV.    Coating Delamination In The Ducts Installed By Archer's Subcontractor........................................................................8

        A.    G-K's Testing Results ........................................................10

            1.    Bio Shield Report............................................................11

            2.    Soil and Materials Engineers, Inc. Report .......................11

            3.    RTI Laboratories Report ..................................................12

        B.    Continued Round Duct Delamination And The FAA's Concerns About The Rectangular Ducts.............................12

        C.    Neff Materials Consulting 2014 Tests ................................14

        D.    Rejection Of The Round Duct, Further Rectangular Duct Testing By SME, And The FAA's Rejection Of The Rectangular Duct ...........14

    V.    The Proceedings Before ODRA .............................................16

SUMMARY OF ARGUMENT ............................................................18

ARGUMENT ...............................................................................21

I.    Standard of Review ............................................................21

II.   ODRA Correctly Concluded That Archer's Claim For Damages Due
      To Proposed Contract Claim 16, Item 10 Was Untimely ........................22

      A.    The Only Claim At Issue In The Petition With Respect To
            Proposed Contract Change No. 16, Item 10—A Delay Claim
            —Is Untimely ..........................................................22

      B.    The Delay Claim Accrued More Than Two Years Before
            Archer Filed Its Notice Of Contract Dispute ..........................24

      C.    Archer's Accrual Theories Are Mistaken ...............................29

III.  ODRA Correctly Concluded That Archer Did Not Timely File Its
      Cumulative Disruption Claim ..............................................35

      A.    Cumulative Impact Claims .............................................36

      B.    Archer's Notices Of Contract Dispute Did Not Assert A
            Cumulative Impact Claim ..............................................37

      C.    None Of Archer's Arguments Demonstrates That It Filed A
            Notice With ODRA For The Cumulative Disruption Claim .........38

IV.   ODRA's Finding That The FAA Reasonably Rejected The
      Rectangular Ductwork Is Supported By Substantial Evidence ...............42

      A.    ODRA's Findings Are Supported By Substantial Evidence .........43

      B.    The FAA Did Not Impose An Extra-Contractual Adhesion
            Standard Requirement .................................................48

CONCLUSION ...............................................................................55

iii

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*ASFA Int'l Constr. Indus. & Trade, Inc.*,
   No. 57880, 14-1 BCA ¶35,736, 2014 ASBCA LEXIS 281 ........................ 25, 27

*Big Chief Drilling Co. v. United States*,
   15 Cl. Ct. 295 (1988) ...................................................................41

*Burns v. Director, Office of Workers' Comp. Programs*,
   41 F.3d 1555 (D.C. Cir. 1994) ........................................................21

*Caddell Const. Co., Inc. v. GSA*,
   No. 7991, 91-1 BCA ¶ 23478, 1990 GSBCA LEXIS 654 ........................ 43, 44

*CEMS, Inc. v. United States*,
   59 Fed. Cl. 168 (2003) ..................................................................23

*Csh Contractors, Inc. v. NASA*,
   No. 476-2, 77-2 BCA ¶ 12814, 1977 NASA BCA LEXIS 4 ...........................41

*\*Electric Boat Corp. v. Sec'y of Navy*,
   958 F.3d 1372 (Fed. Cir. 2020) ................................................... 32, 34

*Engineered Maint. Servs., Inc. v. United States*,
   55 Fed. Cl. 637 (2003), *aff'd,* 89 F. App'x 267 (Fed. Cir. 2004) .......................41

*George E. Jensen Constr., Inc. v. GSA*,
   No. 3260, 71-1 BCA ¶ 8850, 1971 GSBCA LEXIS 56 ...................................30

*Granite Constr. Co. v. United States*,
   962 F.2d 998 (Fed. Cir. 1992)..........................................................43

*Harter Tomato Prods. Co. v. NLRB*,
   133 F.3d 934 (D.C. Cir. 1998) ........................................................22

iv

*Hogan Constr., Inc.,
  Nos. 38801, 39014, 90-3 BCA ¶ 22969, 1990 ASBCA LEXIS 193..................51

*In Matter of Appeal of Custom Printing Co.,
  GPOBCA No. 28-94, 1997 WL 128720 (Mar. 12, 1997) ...................................51

Int'l Data Prod. Corp. v. United States,
  492 F.3d 1317 (Fed. Cir. 2007) ..........................................................................34

*J.A. Jones Mgm't Servs. v. FAA,
  225 F.3d 761 (D.C. Cir. 2000).............................................................. 21, 22, 47

J.D. Hedin Constr. Co. v. United States,
  347 F.2d 235 (Ct. Cl. 1965) ...............................................................................30

Jackson Constr. Co. v. United States,
  62 Fed. Cl. 84 (2004) .........................................................................................36

Johnson & Sons Erectors Co. v. United States,
  231 Ct. Cl. 753 (1982) .......................................................................................34

Kisser v. Cisneros,
  14 F.3d 615 (D.C. Cir. 1994)..............................................................................21

Lowell Monument Co. v. Dep't of Veterans Affairs,
  No. 1191, 77-1 BCA ¶ 12439, 1977 VA BCA LEXIS 12............................ 49, 50

Matter of Contract Dispute of Martin Resnick Constr. Co.,
  99-ODRA-00111, 2000 WL 36731263 (June 30, 2000) ....................................39

McMillin Bros. Constr., Inc. v. Dep't of Energy,
  No. 328-10-84, 91-1 BCA ¶ 23351, 1990 EBCA LEXIS 10 ..............................37

*Multimax, Inc. v. FAA,
  231 F.3d 882 (D.C. Cir. 2000).........................................................................3, 21

*Nash Metalware Co., Inc. v. GSA,
  No. 11951, 94-2 BCA ¶ 26780, 1994 GSBCA LEXIS 98 ..................................49

v

*Norman Eng'g Co. v. NASA,*
    No. 1189-12, 92-2 BCA ¶ 24900, 1992 NASA BCA LEXIS 1 .........................36

*NRM Corp. v. Hercules, Inc.,*
    758 F.2d 676, 679–80 (D.C. Cir. 1985)...................................................... 22, 23

*Paragon Energy Corp. v. United States,*
    229 Ct. Cl. 524 (1981) ......................................................................34

*Pittman Constr. Co. v. United States,*
    2 Cl. Ct. 211 (1983) .........................................................................36

*Redland Co. v. United States,*
    97 Fed. Cl. 736 (2011) ......................................................................34

*Robinson Quality Constructors,*
    No. 55784, 09-2 BCA¶ 34,171, 2009 ASBCA LEXIS 57 .................................28

*Rustler Constr., Inc. v. Columbia,*
    211 A.3d 187 (D.C. 2019) ....................................................................6

*Sec'y of Lab. v. Keystone Coal Min. Corp.,*
    151 F.3d 1096 (D.C. Cir. 1998)..........................................................47

*Sigma Constr. Co, Inc.,*
    No. 37040, 91-2 BCA ¶ 23926, 1991 ASBCA LEXIS 104 ..............................44

*\*Standard-Thomson Corp.,*
    No. 15772, 72-1 BCA ¶ 9220, 1971 ASBCA LEXIS 113 .................................49

*Triax–Pacific v. Stone,*
    958 F.2d 351 (Fed.Cir.1992).................................................................33

*United States v. Law,*
    528 F.3d 888 (D.C. Cir. 2008)..............................................................23

vi

*Valenzuela Eng'g, Inc.*,
  No. 53608, 04-1 BCA ¶ 32517, 2004 ASBCA LEXIS 7 ....................................44

**Western Air Lines v. CAB*,
  495 F.2d 145 (D.C. Cir. 1974) ................................................................ 21, 47

**Zafer Constr. Co. v. United* States,
  151 Fed. Cl. 735 (2020) ....................................................................................28

**Statutes**

41 U.S.C. § 3301 ....................................................................................................3

41 U.S.C. § 7103(a) .............................................................................................31

49 U.S.C. § 40110(d) ........................................................................................3, 4

49 U.S.C. § 46110(a) ........................................................................................3, 4

49 U.S.C. § 46110(c) ...........................................................................................21

**Regulations**

14 C.F.R. pt. 17 ......................................................................................... 3, 4, 31

14 C.F.R. § 17.3(a).............................................................................................25

14 C.F.R. § 17.3(b) ................................................................................. 25, 26, 30

14 C.F.R. § 17.3(h) ..................................................................................... 25, 31

14 C.F.R. § 17.3(t) ...............................................................................................5

14 C.F.R. § 17.27(a)(3) ......................................................................................40

14 C.F.R. § 17.27(c)...........................................................................................25

14 C.F.R. § 17.33(l) ..............................................................................................4

14 C.F.R. § 17.41 ..................................................................................4

48 C.F.R. Chapter 1 (FAR) ...................................................................3

FAR 33.201 ........................................................................................32

FAR 52.236–2 .....................................................................................41

# **GLOSSARY**

| | |
|---|---|
| AMS | Acquisition Management System |
| ASBCA | Armed Services Board of Contract Appeals |
| ATCT | Airport Traffic Control Tower |
| AWC | Archer Western Corporation, LLC |
| FAA | Federal Aviation Administration |
| FAR | Federal Acquisition Regulation |
| G-K | Gallagher-Kaiser Corporation |
| HVAC | Heating, ventilation, and air conditioning |
| ODRA | Office of Dispute Resolution for Acquisition |
| PCC | Proposed Contract Change |
| RFI | Request for Information |
| RTI | RTI Laboratories |
| SME | Soil and Materials Engineers |
| TRACON | Terminal Radar Approach Control building |

[ORAL ARGUMENT NOT YET SCHEDULED]

No. 20-1520

IN THE UNITED STATES COURT OF APPEALS
FOR THE D.C. CIRCUIT

ARCHER WESTERN CONTRACTORS, LLC,

Petitioner,
v.

U.S. DEPARTMENT OF TRANSPORTATION
and FEDERAL AVIATION ADMINISTRATION,

Respondents.

On Petition For Review Of Order
Of The Federal Aviation Administration 15-ODRA-00725, -00735

## INITIAL BRIEF FOR RESPONDENTS

## JURISDICTIONAL STATEMENT

Respondent, the Federal Aviation Administration (FAA), has identified no basis to challenge this Court's jurisdiction to review the October 28, 2020 Final Order of the FAA, which adopted the findings and recommendations of the Office of Dispute Resolution for Acquisition (ODRA) and made final ODRA's interlocutory order granting in part the FAA's motion to dismiss and for summary decision as a matter of law with respect to the claims of petitioner Archer Western Contractors, LLC (Archer).

## COUNTER-STATEMENT OF THE ISSUES

1.      Whether ODRA properly dismissed as untimely Archer's delay damages claim for Proposed Contract Change 16, Item 10 where by regulation, contract disputes must be filed with ODRA within two years of claim accrual, and where Archer filed its notice of dispute on April 3, 2015, but was aware of alleged Government-induced delays as early as January 4, 2013, when Archer ordered to its subcontractors to stop work on January 4, 2013, and no later than February 7, 2013, by which time Archer was tracking delays.

2.      Whether ODRA properly dismissed as untimely Archer's cumulative impact claims on behalf of its subcontractors where ODRA found that the claims had accrued before 2015, yet ODRA first received notice of Archer's claims on behalf of its subcontractors on September 12, 2019, when Archer filed its pre-hearing submission with ODRA.

3.      Whether substantial evidence supports ODRA's finding that the FAA reasonably rejected the rectangular ducts where ODRA reached that decision after a hearing; considered the totality of the evidence, including technical reports and tests employed and relied upon by all the parties; and took into account competing expert opinions, finding FAA's expert more persuasive.

2

## STATUTES AND REGULATIONS

The addendum contains pertinent statutes and regulations, except for 5

U.S.C. § 556, 5 U.S.C. § 706, 49 U.S.C. § 46110(a), 14 C.F.R. § 17.25(a)-(b), and

14 C.F.R. § 17.27, which are contained in petitioner's addendum.

## STATEMENT OF THE CASE

I.     Nature Of The Case And Course Of Agency Proceedings

This is a Federal government contract dispute arising out of a contract that

the FAA's Western Pacific Region awarded to Archer in 2010, for approximately

$40 million to construct various structures at the McCarran International Airport in

Las Vegas, Nevada (the Project or McCarran).

On April 3, 2015, and June 4, 2015, Archer filed notices of contract disputes

with ODRA, asserting numerous claims arising out of the project.  ODRA handles

bid protests and contract disputes that arise under the FAA's Acquisition

Management System (AMS), which is codified at 14 C.F.R. pt. 17. *Multimax, Inc.*

*v. FAA*, 231 F.3d 882, 884 (D.C. Cir. 2000).[1]  When a contract dispute is filed with

---

[1] Pursuant to 49 U.S.C. § 40110(d), the FAA adopted the AMS—its own set of
procedures—to address the agency's "unique" procurement needs,
"notwithstanding provisions of Federal acquisition law." § 40110(d)(1).  Thus,
FAA acquisitions, bid protests, and contract disputes are governed by regulations
unique to the FAA, rather than the Federal Acquisition Regulation (FAR), 48
C.F.R. Chapter 1, or the Competition in Contracting Act, 41 U.S.C. § 3301.  *See* 49

3

ODRA, ODRA issues "findings and recommendations," 14 C.F.R. § 17.33(l), which are followed by a final order issued by the FAA.  14 C.F.R. § 17.41.  Final FAA orders adjudicating contract disputes are subject to review in this court or "in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business."  49 U.S.C. § 46110(a).

On June 8, 2017, ODRA issued a decision dismissing as untimely several of Archer's claims.[2]  On October 28, 2020, the FAA Administrator incorporated and adopted in a final order ODRA findings and recommendations disposing of the remainder of Archer's contract disputes.

Final FAA orders adjudicating contract disputes are subject to review by petition filed "not later than 60 days after the order is issued."  49 U.S.C. § 46110(a).  Archer timely filed its petition for review of this order on December 28, 2020.

---

U.S.C. § 40110(d).  The FAA's acquisition and dispute resolution procedures are codified in 14 C.F.R. pt. 17.

[2] ODRA indicated that "[t]his is an Interlocutory Order.  It will become final and appealable upon issuance of an Administrator's order at the conclusion of this case."  Interlocutory Order at 26 n. 24.

4

II.    Contract Overview

The contract's main components were construction of a 22-story Airport

Traffic Control Tower and a four-story, approximately 60,000 square feet Terminal

Radar Approach Control (TRACON) building at McCarran.  Final Order at 1, 5.

Archer had numerous subcontractors, including Gallagher-Kaiser Corporation (G-

K).  The contract was awarded on September 3, 2010, and the period of

performance originally was 730 calendar days, with a completion date of May 31,

2013.  Interlocutory Order at 5.  There were numerous contract modifications over

the course of the project.  Ultimately, construction was not substantially completed

until July 1, 2015.

III.    Archer's Stop Work And Performance Delays In Response To The FAA's
         Proposed Contract Claim 16, Item 10

On October 26, 2012, Archer submitted a Request for Information,[3] RFI No.

804, to the FAA[4] advising that Archer could not construct the mechanical shaft

wall system in the TRACON building as designed.  Interlocutory Order at 17; A1-

0003; J26-0351-0356.  In response to this Request for Information, on November

1, 2012, the FAA advised Archer that substantial design changes would be

---

[3] A Request for Information or RFI seeks clarification of contract requirements.

[4] The FAA organization(s) responsible for the procurement or contracting
activity is referred to as the "Product Team."  14 C.F.R § 17.3(t).  "FAA," "the
Region," and "Product Team" are used interchangeably in the record.

forthcoming for Archer to analyze and price.   Interlocutory Order at 17; A1-0033. Archer requested that the FAA direct Archer to cease work because changes in the mechanical shafts would affect the ongoing electrical, plumbing, mechanical and partition construction activities.  Interlocutory Order at 17-18; A1-0003.

On December 26, 2012, the FAA issued Proposed Contract Change 16, which provided construction details for 18 change items, with "Item 10" of these change items relating to Archer's Request for Information No. 804.  *See* Interlocutory Order at 18; J26-0367-0371.  In response, in a letter dated December 27, 2012, Archer advised the FAA that Proposed Contract Change 16 would cause it to "incur additional costs and critical path schedule impacts"[5] and that it was thus evaluating which changes might require stop-work orders.  Interlocutory Order at 18; A1-0081.

Less than two weeks later, on January 4, 2013, Archer in fact ordered its subcontractor to cease further installation of the mechanical shaft walls "in the interest of mitigating the costs associated with PCC 016 changes even though ceasing the work in the meantime adversely impacted the critical path of the

---

[5] "The critical path is the longest sequence of activities in a project plan that must be completed on time for the project to complete by its due date." Interlocutory Order at 5 n.4 (citing *Rustler Constr., Inc. v. District of Columbia*, 211 A.3d 187, 193 (D.C. 2019)).

6

schedule." Interlocutory Order at 18; A1-0005; *see also* A1-0105, -0138. In a January 7, 2013 daily report, Archer reported that "[a]ll work on the TRACON shafts is now on hold pending approval of PCC 16." J22-0010-0012. On February 7, 2013, Archer submitted a proposal to perform the work identified in Proposed Contract Change 16, including an estimate of its direct costs to perform the changes and a time impact analysis asserting a 146-calendar day extension of the contract performance, which included 111 days for Item 10 specifically.[6] Interlocutory Order at 19; A1-0004; J26-0482, -0487.

On April 3, 2013, the FAA directed Archer to proceed with Item 10. J26-0624. Later in 2013, in a bilateral contract modification the parties signed on December 24, 2013 (with an effective date of August 29, 2013), the parties agreed to the direct costs for the work for Item 10, in Contract Modification 34. J2-0108-0110. This modification included a release:

> In consideration of the modification agreed to herein as a complete equitable adjustment, the Contractor hereby releases the Government from any and all liability under this contract for future equitable adjustments attributable to such facts or circumstances giving rise to this modification.

---

[6] As discussed below, a contract change may result in increased direct costs, as well as schedule delays. Schedule delays may entitle the contractor to increased costs at a daily rate.

J2-0108-0109.

On December 4, 2014, the FAA issued a unilateral contract modification, Modification No. 51. This modification addressed the delays associated with Item 10 by granting additional time extensions and delay costs for that extension. J2-0166-0171 (noting that Modification 34 separately addressed direct costs for the changed work). Archer disputes that Modification No. 51 granted an adequate time extension and delay costs. Pet. Br. at 5 (citing Modification No. 51).

IV.    Coating Delamination In The Ducts Installed By Archer's Subcontractor

Archer hired G-K to perform the mechanical and plumbing work, including ductwork. Final Order at 13. The contract required the application of an antimicrobial coating "to the surface of sheet metal that will form the interior surface of the duct." Final Order at 12-13; J6-0231-0232. G-K contracted for Liberty Duct to provide the ducts, including the anti-microbial coating. Final Order at 13. The duct manufacturer was Bio Shield. *Id*. Archer, through G-K, provided a submittal that included Bio Shield product literature. *Id*. The literature represented that the antimicrobial coating would disrupt and stop the growth of microbes within the heating, cooling, and ventilation system. *Id.*; J26-0244.

The Bio Shield product literature emphasized that the antimicrobial coating must be applied to "the recommended primer" or "directly to 'properly cleaned

8

metal.'"  Final Order at 13; J26-0248.  The literature advised that "one of the most important steps" for applying the antimicrobial coating was to prepare the surface and warned that without adequate cleaning, "future [coating] failure could occur."  Final Order at 13; J26-0248.

The literature also identified the antimicrobial coating to have an "adhesion level" rated as "5B on steel and aluminum" based on "ASTM D3359, Method B" testing.  Final Order at 13; J26-0250.  The ASTM D3359 test is "'used to establish whether the adhesion of a coating to a substrate is at a generally adequate level.'"  Final Order at 13-14 (quoting J26-1780).  The ASTM D3359 testing methods will not reflect precise levels of adhesion, but generally "reflect 'large differences in adhesion,'" on a "'limited scale of 0 to 5.'"  Final Order at 14 (quoting J26-1780-1781).  The ASTM D3359 explains that "[i]f a coating is to fulfill its function of protecting or decorating a substrate, it must adhere for the expected service life."  J26-1781.

Liberty Duct applied the anti-microbial coating during the fabrication of the ductwork.  Final Order at 14.  In July 2012, G-K started installing the ducts, *id.*, which generally were either round ducts (also called spiral ducts) or rectangular ducts.

A few months after the installation had commenced, G-K learned that the

9

coating on the round duct was flaking.  Final Order at 14-15.  The FAA, on the other hand, did not learn of the flaking until January 2014, after G-K had installed about 95 percent of the ductwork, and Archer's other subcontractors had enclosed a substantial portion of the ductwork behind the walls of the building.  *Id.* at 17.[7]  Specifically, in January 2014, after startup of the mechanical systems, flakes of delaminated antimicrobial coating passed through the HVAC system and became airborne within the building spaces.  Final Order at 16-17; J26-1973.  Upon inspecting the work, the FAA confirmed that the interior duct coating was delaminating and notified Archer and G-K of the ductwork's failure.  Final Order at 17; J26-1993.

A.    G-K's Testing Results

At the end of January 2014, G-K started an investigation of the antimicrobial coating issue, which ultimately involved analyses by three different consultants.  Final Order at 17.

---

[7]  ODRA found that "G-K concealed the duct issues from AWC and the FAA by keeping different versions of daily reports, and by providing sanitized versions to AWC and the FAA."  Final Order at 65.  ODRA found that Archer, because of its subcontractor G-K's actions, breached its express and implied duties of good faith under the contract and thus denied Archer's claim for economic waste (based on having to remove the ducts).  *Id.* at 67.  Archer does not appeal ruling finding.

1.    Bio Shield Report

Initially, in January 2014, G-K sent samples of the ductwork to the coating

manufacturer, Bio Shield, to determine the cause of the flaking.  Final Order at 17-

18; J26-1767.  Bio Shield conducted an ASTM D3359 test on both round and

rectangular (square) duct samples and determined that the rectangular duct sample

had an ASTM adhesion between 4.5 and 5, but the "'spiral duct was another

story.'"  Final Order at 17-18 (quoting J26-1788-1790).  Bio Shield put it bluntly:

the "'film was full of junk'"; there was evidence of "'a poor or non-existent

surface cleaning prior to painting'"; and there was "'likely oil'" on the surface.

Final Order at 17-18 (quoting J26-1789).  Bio Shield also observed "'very poor

coating of the outside of the duct on both samples,'" which Bio Shield said was

"'plainly . . . very sloppy work,'" and was "'a pretty good indication of what was

going on when they cleaned and painted the inside of the duct.'"  Final Order at

17-18 (quoting J26-1789).

2.    Soil and Materials Engineers, Inc. Report

In February 2014, G-K hired Soil and Materials Engineers, Inc. (SME) to

conduct adhesion testing of the duct coating.  Final Order at 18-19; J26-2584.  Like

Bio Shield, SME performed ASTM D3359 tests to round duct samples and

rectangular duct samples.  J26-2584.  SME found that 92 percent of the round duct

11

samples and 43 percent of the square and rectangular duct samples achieved, on a scale of 0B-5B, a rating of 3B or lower.   Final Order at 19; J26-2584.   Notably, only one sample out of all the round *and* rectangular duct samples achieved the adhesion rate of 5B specified in the Bio Shield product literature.   J26-1807-1808; Final Order at 19.

3.    RTI Laboratories Report

In March 2014, G-K then hired another independent company, RTI Laboratories (RTI), to determine the possible root cause for the delamination of the coatings.   Final Order at 21; J26-1852-1863.   In a March 2014 report, RTI explained its findings that the coating was "'brittle and losing adhesion,'" had "'lots of debris in the coating either due to dirt in the wet coating prior to application or dirt on the surface of the substrate prior to coating from improper surface preparation,'" and—like the Bio Shield findings—observed an "'oily material . . . under the failed coating.'"   Final Order at 21 (quoting J26-1852).

B.    Continued Round Duct Delamination And The FAA's Concerns About The Rectangular Ducts

Also in March 2014, Archer and G-K purged the duct system by blowing air through it at high speeds, installing filters, and using a video camera to monitor the extent of delamination.   Final Order at 22; J26-1889-1891.   This purge revealed flaking throughout the building in varying amounts, but ultimately was

12

inconclusive as to whether the rate of delamination was slowing.  Final Order at 22-23; J26-1895-1907.

By May 2014, the FAA observed that the coating was coming out in "sheets," not just flakes, and became concerned that the flakes could "foul" the air handling units.  Final Order at 20, 24; J26-1956-1960.  This was particularly troublesome for McCarran Airport because of the need for a "reliable, heating, cooling, and ventilation to a 'critical air traffic control facility operating in a desert climate.'"  Final Order at 20 (quoting J-26-1850).  Thus, in May 2014, the FAA informed Archer that it had lost all confidence in the adhesion of the antimicrobial coating product.  Final Order at 24-25; J26-1960.

The round duct delamination and a "white, crusty film on the surface of the galvanized duct" caused the FAA to be concerned about the delamination in the rectangular duct and the process used to fabricate all the ductwork.  A4-0009.  The FAA concluded that it would be "'very short-sighted to remove only the round ducts'" because "'[t]here are no guarantees that the 'process' that has shown up in the round ducts won't eventually surface in the rectangular ducts.'"  Final Order at 25 (quoting A4-0009).  Thus, as of May 2014, the FAA also had "'very little confidence in the adhesion of the antimicrobial coating in the rectangular ducts.'"  Final Order at 25 (quoting Tr.1294).

13

C.    Neff Materials Consulting 2014 Tests

The FAA hired Mr. Michael Neff of Neff Materials Consulting to understand and analyze its options for the delamination.  Final Order at 26.  The FAA sent samples to Mr. Neff from both the rectangular and round ducts.  Final Order at 26; J26-2019-2022.  In a June 2104 report, Mr. Neff reported minor bubbles and voids in the coating in two round and two square samples, but not "'severe delamination failures.'"  Final Order at 26 (quoting J26-2019-2022).  Upon analyzing additional round duct samples, Mr. Neff concluded that the delamination was "'due to the presence of oily residues on the surface of the duct which in turn caused poor adhesion' of the antimicrobial coating."  *Id*. (quoting J26-2019-2021).  For the FAA, Mr. Neff's report confirmed the earlier findings of RTI and Bio Shield that the delamination was likely due to the failure to properly prepare the ducts before application of the coating.  Final Order at 26.

D.    Rejection Of The Round Duct, Further Rectangular Duct Testing By SME, And The FAA's Rejection Of The Rectangular Duct

On May 19, 2014, the FAA formally rejected all of the round ducts and advised that it was potentially going to reject the rectangular ducts as well.  Final Order at 25; J26-2000.  G-K claimed, however, that for the rectangle ducts, the coating was acceptable and would—in G-K's words—perform "over the long term

14

without delamination." Final Order at 26 (citing F2-2091). Yet, FAA's continued on-site adhesion testing of the rectangular ductwork failed to assure the FAA that these ducts would not also delaminate. Final Order at 27. Rather, the data showed that in some places, the ductwork was "'getting better, [but] in some places, it was getting worse.'" Final Order at 27 (quoting Tr.1345); Tr.1347.

At this point, Archer itself requested that SME conduct additional field adhesion testing of the square/rectangular ducts. Final Order at 27. SME again applied the ASTM D3359 test to the samples, and on June 17, 2014, reported that 44% of ASTM D3359 adhesion tests on the rectangular duct showed adhesion levels of 3B or lower. Final Order at 27-28; J26-2054-2058.

On June 17, 2014, the FAA advised Archer and G-K that it was rejecting almost all the rectangular ducts. Final Order at 28; J26-2053.[8] In a follow-up letter, the FAA informed Archer and G-K that it was rejecting the rectangular duct "due to failure of the duct, which testing confirmed lacked sufficient 'adhesion based on improper preparation for, and/or application of, the epoxy coating.'" Final Order at 28 (quoting J26-2109-2110). Thus, the FAA had "'no confidence'"

---

[8] Archer asserts that "[a]t the time the FAA rejected the Rectangular Duct on June 17, 2014, no testing had been done on Rectangular Duct." Pet. Br. at 39. This is incorrect. ODRA cites to the February 28, 2014 SME tests and reproduces the test results in its findings and recommendation. Final Order at 18-19 (citing J26-1803).

that the coating would adhere "'to the inside of the ducts for the life of the facility.'" *Id.* So, the FAA was "'compelled to reject all of the ducts and remediate the issues now,'" to avoid the risk of requiring remediation of the HVAC system when the Airport was operational, which would "'adversely impact[] air traffic control, regionally and nationally.'" *Id*.

G-K thus removed and replaced the rectangular ducts. Final Order at 28.

## V.    The Proceedings Before ODRA

Archer filed two notices of contract disputes, one dated April 3, 2015, and one dated June 4, 2015, with ODRA. Archer's April 3, 2015 notice of contract dispute alleged entitlement to an equitable adjustment (1) for actual costs and time extensions (delay damages) due to significant design modifications as a result of the FAA's Proposed Contract Change 16, *see* Final Order at 3; A-1 at 4, 14; and (2) for the FAA's rejection of certain glass panels, *see* Final Order at 3; A-1 at 9, 15. Archer's June 4, 2015 notice of contract dispute alleged that the FAA had wrongfully rejected the coated duct and sought an equitable adjustment for the cost of remediating and replacing the ducts. Final Order at 3. In both disputes, Archer sought monetary damages on behalf of itself, along with pass-through claims for several of its subcontractors.

16

The FAA filed a motion to dismiss portions of Archer's first dispute. Interlocutory Order at 1.  As relevant to this appeal, ODRA's Interlocutory Order dismissed as untimely Archer's claim for damages in connection with Proposed Contract Change 16, including Item 10 of that proposed contract change.  ODRA found that the claim accrued when the FAA issued that proposed contract change on December 26, 2012, because Archer considered the change request to require additional work, Archer began tracking costs and delays associated with the additional work, and Archer expected the contract to be adjusted accordingly.  *See* Interlocutory Order at 17-19.

The parties engaged in discovery, and in September 2019, the parties filed pre-hearing submissions and exhibits.  In Archer's 2019 pre-hearing submissions, Archer asserted entitlement for the cumulative impact and disruption of work.

ODRA conducted a hearing from October 28, 2019, to November 7, 2019. The parties filed post-hearing briefs.  The record closed on January 6, 2020, and ODRA issued Findings and Recommendations, recommending denial of Archer's claim for an equitable adjustment for the cost of replacing rectangular ductwork and dismissing the claim for disruption damages and cumulative impact claims on behalf of its subcontractors.  Final Order at 43, 55-56, 79-80.

17

In its Finding and Recommendations, ODRA extensively discussed the facts and evidence surrounding the FAA's decision to reject the rectangular duct. Final Order at 12-29, 57-61. Ultimately, based on expert testimony, test results on which all parties had relied, as well as similarities in the oily condition of the round and rectangular ducts, ODRA concluded that the information available to the FAA supported the FAA's concern that the rectangular ducts would delaminate like the round ducts. Final Order at 61.

As to the cumulative impact claim, ODRA reviewed Archer's 2015 notices of contract dispute and determined that Archer had not asserted such a claim. Rather, Archer asserted that claim for the first time in its 2019 pre-hearing submission. As such, ODRA concluded that the claim was untimely.

On October 28, 2020, the FAA adopted ODRA's Findings and Recommendations in a Final Order.

This petition for review followed.

## **SUMMARY OF ARGUMENT**

Archer fails to demonstrate that the FAA erred in adopting ODRA's findings and recommendations because ODRA's decision is supported by substantial evidence, and is neither arbitrary nor capricious. This Court should affirm.

*First*, FAA regulations require a contract dispute to be filed within two years of its accrual.  Archer argues that its April 3, 2015 notice of dispute timely asserted its claim relating to Proposed Contract Change 16, Item 10.  To the contrary, that claim accrued when Archer first experienced Government-induced delays.  Those delays, by Archer's own admission, began as early as January 4, 2013, and certainly no later than February 7, 2013—that is, more than two years before the April 3, 2015 notice of contract dispute.

Archer's position that its claim was timely revolves around irrelevant questions about when the FAA ordered Archer to proceed with the Item 10 work, when Archer had an obligation to perform the Item 10 work, and when the FAA refused to grant Archer an equitable adjustment for the Item 10 work.  But a delay claim—and that is what remains of the claim for Item 10—accrues when the delays begin, not when the obligation to perform changed work arises.  Thus, although ODRA tied the accrual date of the claim for cost and delays for the changed work to the date of the FAA's Proposed Contract Change 16 (*i.e.*, December 26, 2012), the claim is nonetheless untimely given that Archer ceased work more than two years before it filed its notice of contract dispute.

*Second*, Archer has not demonstrated that its 2015 notices of contract disputes asserted a cumulative impact claim.  Rather in the 2015 notices, Archer

19

asserted different, distinct claims for direct costs, delay damages, and specific impact claims.  Archer first raised the cumulative impact claim in a pre-hearing filing in 2019—more than two years after the claim had accrued.  Archer's assertion that it did assert the claim in its 2015 notices fails to recognize the distinct nature of a cumulative impact claim.  Nor may Archer rely on the FAA's own filings as a substitute for a timely filed notice of contract dispute.  And Archer's argument that the FAA was not prejudiced by the untimely filing is based on inapposite case law.

*Third*, ODRA's decision that the FAA reasonably rejected the rectangular duct as non-conforming is supported by substantial evidence.  ODRA considered the totality of the evidence, including the catastrophic failure of the round duct, which was fabricated in the same facility as the rectangular duct; the oil residue common to both the round and rectangular duct; the testing employed by all the parties; and expert testimony.  At most, Archer merely presents a different perspective on the facts, which does not demonstrate any reversible error.  Archer's argument that the FAA required heightened performance standards by relying on the ASTM D3359 test falls flat given that the FAA is entitled to use a reasonable tests and, here, all parties had used and relied on the ASTM D3359 test.

The Court should affirm the FAA's order.

20

# **ARGUMENT**

I.    Standard of Review

This Court's review of FAA orders "is confined to determining whether the FAA's order adopting the ODRA's findings and recommendations is arbitrary or capricious or contrary to law." *Multimax*, 231 F.3d at 886 (citing 5 U.S.C. § 706(2)(A)); *see also J.A. Jones Mgm't Servs. v. FAA*, 225 F.3d 761, 764 (D.C. Cir. 2000). Accordingly, the Court may reverse the FAA's order only "'if the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment.'" *Jones*, 225 F.3d at 764 (quoting *Kisser v. Cisneros*, 14 F.3d 615, 619 (D.C. Cir. 1994)).

ODRA's findings of fact "are conclusive" as long as they are "supported by substantial evidence." 49 U.S.C. § 46110(c). "Substantial evidence" means "more than a scintilla, but less than a preponderance." *Burns v. Director, Office of Workers' Comp. Programs*, 41 F.3d 1555, 1562, n.10 (D.C. Cir. 1994) (internal quotation marks omitted). Further, ODRA's decision "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Western Air Lines v. CAB*, 495 F.2d 145, 152 (D.C. Cir. 1974). In determining whether ODRA's decision is supported by substantial evidence, the Court asks "'whether the [agency's] interpretation of

21

the facts is reasonably defensible,'" not "'whether the [petitioner's] view of the facts supports its version of what happened.'" *Jones*, 225 F.3d at 765 (quoting *Harter Tomato Prods. Co. v. NLRB*, 133 F.3d 934, 938 (D.C. Cir.1998)).

## II.    ODRA Correctly Concluded That Archer's Claim For Damages Due To Proposed Contract Claim 16, Item 10 Was Untimely

ODRA correctly found that "[t]he undisputed record further shows that [Archer] failed to timely file this claim as a contract dispute with ODRA, inasmuch as accrual of this claim item occurred more than two years prior to April 3, 2015, when it was filed." Interlocutory Order at 19. ODRA's conclusion was correct. Archer's arguments seeking reversal of ODRA's decision misapprehend the issue here.

### A.    The Only Claim At Issue In The Petition With Respect To Proposed Contract Change No. 16, Item 10—A Delay Claim—Is Untimely

*First*, Archer's arguments fail to recognize that the only issue here is the timeliness of its *delay* claim because the parties previously resolved the direct costs claim. In its April 3, 2015 notice of contract dispute, Archer sought its actual, direct costs for changed work, as well as delay damages, for Item 10. A1-0009. These are distinct theories of recovery.[9]  *See NRM Corp. v. Hercules, Inc.*, 758

---

[9] In its request for relief in its brief, Archer also seeks rulings about a disruption claim arising from Proposed Contract Change 16. Pet. Br. at 54. It is not clear that Archer ever pled such a claim, but even if it did, Archer itself argued that the claim

22

F.2d 676, 679-80 (D.C. Cir. 1985) (explaining the "three distinct categories" of damages:  (1) costs of performing the changed work itself; (2) costs *created by the changes on other 'unchanged' parts of the project*," such as delay costs; and (3) "costs stemming from delays not caused by the changes at all").  If the Government adds work, causes a suspension of work, or disrupts the contractor's work, the contractor may recover not only the costs attributable to the change worked itself, but also "delay damages as compensation for extended performance due to the change."  *CEMS, Inc. v. United States*, 59 Fed. Cl. 168, 226 (2003).

In Contract Modification No. 34, however, the parties already agreed to the fixed costs for the changes in Item 10.  J2-0108-0110.  Modification No. 34 included a release providing that the modification was a complete equitable adjustment for any facts or circumstances giving rise to the modification for compensation for the fixed costs.  J26-0109; *see also* J26-168 (describing the background to Modification No. 34).

Thus, the timeliness of Archer's claim for delay damages is not at issue here.  Indeed, although Archer's brief does not expressly state as much, Archer's only

_____

was associated with its claim for breach of duty of good faith and fair dealing, which ODRA denied, and which Archer does not appeal.  Interlocutory Order at 36 n. 23.  In any event, Archer has waived any challenge about the timeliness of a disruption claim by failing to develop any argument about this claim in its brief. *See United States v. Law*, 528 F.3d 888, 908 n.11 (D.C. Cir. 2008).

complaint is that "[o]n December 4, 2014, the FAA issued Unilateral Contract Modification No. 51 granting additional, but still incomplete, time and costs for the PCC 16, Item 10-related changes." Pet. Br. at 5 (citing J2-0166-0171). Modification No. 51 related only to delay damages, not direct costs, which were separately addressed in Modification 34. J2-0166-0172.[10]

Accordingly, the only question here is the timeliness of Archer's claim for delay damages.

B.    The Delay Claim Accrued More Than Two Years Before Archer Filed Its Notice Of Contract Dispute

Archer's delay claim—like all claims before ODRA—was required to be filed within two years of its accrual.[11] FAA's dispute resolution regulations

---

[10] Nor could Archer argue that it is in fact challenging the timeliness of its direct costs claim because the issue of the timeliness of the claim is moot given the release in Modification No. 34. Further, any argument that the timeliness of the claim is not moot because Archer believes it is entitled to additional direct costs, would be barred by the release.

[11] It is questionable whether, even if Archer's delay claim were deemed timely, Archer would be entitled to any additional delay damages. The FAA already paid Archer $626,500 in delay damages for a total 86 days of alleged delays for Item 10 shaft wall changes. J2-0079, -0081; J2-0166-0173. During the proceedings before ODRA, the parties stipulated to be bound by the findings of a neutral regarding the project schedule and delays, and ODRA adopted the neutral's findings. *See* 2018-01-29 Order Adopting Findings of Compensated Neutral Delay Expert. The neutral found that "PCC 16 did not control the critical path." *Id*., Ex. B at 8. The neutral noted, however, that "[t]he FAA does not seek to 'claw back' any of the days already granted to AWC in time extensions." *Id*., Ex. B at 3 n. 1. As such,

mandate that "[a] contract dispute against the FAA shall be filed with ODRA

within two (2) years of the accrual of the contract claim involved." 14 C.F.R.

§ 17.27(c). FAA's regulations defined accrual as:

> Accrual of a contract claim means that all events relating
> to a claim have occurred, which fix liability of either the
> government or the contractor and permit assertion of the
> claim, regardless of when the claimant actually
> discovered those events. For liability to be fixed, some
> injury must have occurred. Monetary damages need not
> have been incurred, but if the claim is for money, such
> damages must be capable of reasonable estimation. The
> accrual of a claim or the running of the limitations period
> may be tolled on equitable grounds, including but not
> limited to active concealment, fraud, or if the facts were
> inherently unknowable.

14 C.F.R. § 17.3(b); *see also id.* § 17.3(a).

In ODRA's Interlocutory Order, ODRA recognized the correct rule: that

"'[f]or liability to be fixed, some injury must have occurred by inherently

knowable facts.'" Interlocutory Order at 5 (quoting 14 C.F.R. § 17.3(b)). ODRA

explained that although "14 C.F.R. 17.3(h) describes a contract dispute as

requesting, among other things, 'payment of money in a sum certain,' the ODRA

Regulation regarding 'accrual' does not require absolute certainty of the amount

---

the neutral found that he "need not determine whether the modifications already
granted by the FAA represent a proper determination of delay." *Id*.

claimed, but rather only that it 'be capable of reasonable estimation' if any monetary damages have been incurred." *Id*. at 5 (quoting 14 C.F.R. § 17.3(b)).

ODRA found that by February 7, 2013, Archer was tracking costs and delays. Interlocutory Order at 18. ODRA then tied the accrual date back to the date of Proposed Contract Change 16, *i.e.*, the date that set in motion the events leading to Archer's stop work. *Id*. Archer argues that ODRA erred because the FAA's proposal did not obligate Archer to perform any additional work. Pet Br. at 10. Alternatively, Archer argues that the claim did not accrue until the parties failed to agree to an equitable adjustment in December 2014. *Id*.

Archer's arguments are misplaced. Regardless of whether ODRA correctly tied Archer's injury to the December 26, 2012 Proposed Contract Change 16, the delay claim nonetheless accrued before April 3, 2013. Specifically, it accrued by February 7, 2012, if not by January 4, 2013, when Archer admitted it was experiencing delays.

As ODRA recognized, Archer's April 3, 2015 notice of contract dispute complained of its Government-induced delay injuries from Proposed Contract Change No. 16, starting as early as January 4, 2013. Interlocutory Order at 17; A1-0105. Archer notified the FAA on January 4, 2013, that it had directed work to stop, and asserted that this caused "compounding delays." A1-0138. ODRA then

26

found that by February 7, 2013, Archer had already started to track its "cost increases and delay associated with the changed work in order to quantify the impact, and expected the contract to be adjusted accordingly under the Changes clause." Interlocutory Order at 19. Thus, because Archer admitted that it knew of the delays as early as January 4, 2013, and certainly by February 7, 2013, the delay claim accrued more than two years before Archer filed its first dispute notice on April 3, 2015. As such, the claim was untimely, and ODRA correctly dismissed the claim, even if Proposed Contract Change 16 did not create an obligation to perform any additional work.

Decisions from the Armed Services Board of Contract Appeals (ASBCA)[12] and the United States Court of Federal Claims support the conclusion that the delay claim was untimely. These decisions have held that a claim for delay damages accrues once the delay starts. In *ASFA International Construction Industry & Trade, Inc*., the ASBCA held that a Government claim for delay damages accrued

---

[12] Although we reference a number of decisions from agency board of contract appeals in our brief, we recognize that these board decisions are not binding on this Court. This Court has recognized, however, the utility of reviewing "rulings and determinations emanating from . . . quasi-judicial boards" and courts that specialize in contracts and procurement matters, *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971), such as "[t]he boards of contract appeals in the various procurement agencies," and the United States Court of Claims. *Id*. at 1301-02 nn.37-38.

27

once "the government had the right to assess liquidated damages under the

contract;" and that "[s]ubsequent [delay damages] were accumulating and,

therefore, continuing ill effects."  No. 57880, 14-1 BCA ¶35,736, 2014 ASBCA

LEXIS 281, **17 (stating that a claim begins to accrue even if all damages have

not been suffered).  The ASBCA held similarly in *Robinson Quality Constructors*,

explaining that "accrual of a claim can commence without 'all events' of that

claim, including cumulative delay, reaching a point where a complete assessment

of the government's ultimate liability could be made."  *Robinson Quality*

*Constructors*, No. 55784, 09-2 BCA¶ 34,171, 2009 ASBCA LEXIS 57, **4.

These decisions from the ASBCA are consistent with *Zafer Construction*

*Co. v. United* States, 151 Fed. Cl. 735 (2020), *appeal filed*, No. 21-1547 (Fed. Cir.)

(Jan. 14, 2021).  In *Zafer Construction*, the Court of Federal Claims agreed with

the Government that the contractor's claim for delay damages accrued when the

contractor had knowledge of the Government-caused delays.  *Id.* at 740 (rejecting

argument that delay claim did not accrue until the Government rejected its claim

for a request for equitable adjustment).

Thus, because Archer alleged—and the record shows—that Archer was

aware of the delays as early as January 4, 2013, and certainly no later than

February 7, 2013 (both well before April 3, 2013), Archer's delay claim is

28

untimely.  The Court should therefore affirm ODRA's decision dismissing

Archer's claim based on Item 10 as untimely.

C.    Archer's Accrual Theories Are Mistaken

Archer's objection to ODRA's conclusion is based on a mischaracterization

its claim as one for breach of contract for failure to agree to an equitable

adjustment for changed work.  According to Archer, its claim did not accrue until

April 3, 2014, when the FAA issued a notice to proceed on Item 10 because only

then did Archer have an obligation to perform the changed scope of work.  Pet. Br.

at 13-17.  Alternatively, Archer argues that its claim did not accrue until the parties

failed to agree to an equitable adjustment in December 2014.  Pet. Br. at 18.

Archer's arguments are fundamentally flawed.

*First*, Archer's argument that its claim did not accrue until it was obligated

to perform the changed work, Pet. Br. at 13-17, does not square with the nature of

its claim for delay damages, which again is the only live controversy involving

ODRA's accrual ruling.  The question of when the FAA had issued a written order

directing a change and requiring changed *performance* is irrelevant here, however.

That is because the only question here is the timeliness of the *delay* claim, not the

timeliness of the claim for direct costs resulting from the change order.  As

29

demonstrated above, the delay damages accrued when Archer knew of the

Government-caused delay.

Thus, questions about when Archer was required to perform the changed

work, or whether a written order was required to obligate that performance, are

irrelevant to when the delay claim accrued.  Pet. Br. at 13-17.  As such, *J.D. Hedin*

*Construction Company v. United States*, 347 F.2d 235 (Ct. Cl. 1965), and *George*

*E. Jensen Construction, Inc. v. GSA*, No. 3260, 71-1 BCA ¶ 8850, 1971 GSBCA

LEXIS 56, which Archer cites to argue that it had no obligation to undertake the

changed work until a written order was issued, are not relevant to whether the

delay claim accrued more than two years before Archer filed its first notice of

contract dispute.  Pet. Br. at 15-16.

*Second*, according to Archer, until there is a failure to agree to an equitable

adjustment, "the Changes process of the Contract is incomplete, and there can be

no accrual of a contract claim under 14 C.F.R. § 17.3(b)."  Pet. Br. at 19-20.

Archer points to contract Clause 3.10.1-16(e), "Changes and Changed Conditions,"

which states, "[f]ailure to agree to any adjustment shall be a dispute under the

'Disputes' clause."  Pet Br. at 19; J1-0273-75.  In turn, the "Contract Disputes"

clause, contract Clause 3.9.1-1, in the contract incorporates the dispute resolution

process involving ODRA.  J1-0267.  Archer's argument that its claim did not

30

accrue until the process under the Changes and Changed Conditions clause was

complete, however, is mistaken.

The failure to agree to an equitable adjustment may be a contract dispute,

but that does not mean the failure to agree is a *prerequisite* to the accrual of a

claim.  The FAA's dispute resolution process is implemented through ODRA

procedural regulations.  14 C.F.R. pt. 17 (2017).  Section 17.3(h) of those

regulations defines a "Contract Dispute" as:

> a written request to the Office of Dispute Resolution for
> Acquisition seeking resolution, under an existing FAA
> contract subject to the AMS, of a claim for the payment
> of money in a sum certain, the adjustment or
> interpretation of contract terms, or for other relief arising
> under, relating to, or involving an alleged breach of that
> contract.

14 C.F.R. § 17.3(h).  Nothing in this regulation indicates that the failure to agree to

an equitable adjustment is a prerequisite to filing a dispute with ODRA.  Further,

as ODRA explained, unlike the requirement under the Contract Disputes Act, 41

U.S.C. § 7103(a), there is no claim exhaustion requirement in the contract or under

FAA regulations:

> [T]he clear and unambiguous language of the Contract
> does not support AWC's argument that accrual requires
> exhaustion of the process under the Changes clauses.  In
> particular, it does not condition the right to file a dispute
> with the ODRA on any actions taken under the Changes
> clauses.

31

Interlocutory Order at 8.  Thus, the timing of the parties' failure to agree to an equitable adjustment is irrelevant to when the claim accrued under the FAA regulations.

The United States Court of Appeals for the Federal Circuit rejected a similar argument in a contract dispute that arose under the FAR in *Electric Boat Corp. v. Secretary of Navy*, 958 F.3d 1372, 1376-77 (Fed. Cir. 2020).  In that case, the contractor argued that under a clause in its contract, its claim for a price adjustment did not arise until the Navy had rejected its price proposal revision.  *Id.* at 1376.  The Federal Circuit rejected this argument, explaining that the clause at issue did not require exhaustion of any mandatory administrative process, and therefore, the claim began to accrue even before the Navy had refused to adjust the price.  *Id.* at 1377 (applying FAR accrual definition in FAR 33.201, which, similar to the FAA rule, defines claim accrual as "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known").

The same is true here.  There is no exhaustion requirement or any kind of prerequisite to filing a contract dispute with ODRA.  As such, Archer's delay claim accrued when the alleged Government-induced delay commenced—irrespective of when the FAA refused an adjustment under the Disputes clause of the contract.

32

*Third*, Archer characterizes its claim as one for breach of contract. According to Archer, "[t]he FAA's failure to make an equitable adjustment is the breach of Contract forming the basis of Archer's claim, not the FAA's rightful direction of a change."  Pet. Br. at 20; *see also id.* at 10, 17.  This is incorrect, however.

The contract incorporated standard clauses that establish contractual remedies for changed work, namely if a change results in an "increase or decrease the cost of, or time required for performing the work, the Contracting Officer shall make an equitable adjustment . . . upon submittal of a proposal for adjustment (hereafter referred to as proposal) by the Contractor before final payment under the contract." J1-0274 (Clause 3.10-16).  As the Federal Circuit has explained in an analogous situation involving a contract governed by the FAR, "contingencies contemplated by various contract clauses are remediable under those clauses of the contract, not as a breach of the contract."  *Triax–Pacific v. Stone*, 958 F.2d 351, 354 (Fed. Cir. 1992) (emphasis added) (citing John Cibinic, Jr., *et al.*, Administration of Government Contracts 1237 (4th ed. 2006)).

Moreover, "[e]ven when a contingency is not contemplated by a contract clause, such as when 'a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault

33

of the [g]overnment,' the situation is treated as a constructive change to the

contact, not as a breach." *Redland Co. v. United States*, 97 Fed. Cl. 736, 755-56

(2011); *see also Int'l Data Prod. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed.

Cir. 2007) ("Equitable adjustments are corrective measures that make a contractor

whole when the Government modifies a contract."); *Johnson & Sons Erectors Co.*

*v. United States*, 231 Ct. Cl. 753, 759 (1982) (explaining that where claims can be

dealt with under the contract clause, the claim is not one for breach and cannot be

remedied as a breach); *Paragon Energy Corp. v. United States*, 229 Ct. Cl. 524,

526 (1981) (recognizing longstanding principle that "[w]hen the contract makes

provision for equitable adjustment of particular claims, such claims may be

regarded as converted from breach of contract claims to claims for relief under the

contract") (alteration in original; original citation omitted).

The Federal Circuit's decision in *Electric Boat Corporation v. Secretary of*

*Navy*, is again instructive. In that case, the Federal Circuit recognized that the

contractor's injury was *the contract change*, not the Navy's refusal to adjust the

price. *Elec. Boat Corp.*, 958 F.3d at 1375. Thus, despite the "breach of contract"

nomenclature in Archer's notices of contract dispute and its brief, Archer's claims

arose under the contract and are simply requests for an equitable adjustment.

34

Accordingly, the delay claim—seeking an equitable adjustment—arose when the alleged Government-induced delays started, not when the Government issued a notice to proceed with Item 10, or when the FAA denied Archer's request for an equitable adjustment.

III.    ODRA Correctly Concluded That Archer Did Not Timely File Its Cumulative Disruption Claim

ODRA correctly concluded that Archer had not timely presented its claims for *cumulative* disruption, or impact, damages.[13]  As we explain below, a cumulative impact claim is distinct from a claim for changes or delay.  ODRA correctly held that Archer asserted no cumulative impact claim in its 2015 notices and instead raised the claim for the first time in its 2019 pre-hearing submission.

Archer's challenges to ODRA's conclusion gloss over the distinctions among a cumulative impact claim, a claim for direct damages, and a claim for delays.  The Court should affirm ODRA's finding that Archer's cumulative impact claim was untimely.

_____

[13] Archer's brief refers to this cumulative impact claim as simply "Disruptions." Pet. Br. at 24 n.10 (explaining that it uses the term "Disruptions" to refer to "all types of related claims, causes, and damages, including but not limited to: impacts, inefficiencies, lost productivity and the like).  Nonetheless, Archer acknowledges that its claim is one for *cumulative* disruptions and impacts.  *See* Pet. Br. at 24 (arguing that ODRA had notice of Archer's claims "on behalf of its subcontractors for cumulative Disruptions"); *id*. at 25 (referring to "cumulative Disruptions"); *id.* at 29 (noting that claim requires "cumulative effect" to be examined).

A.    Cumulative Impact Claims

ODRA concluded that "[a]s for the alleged cumulative cost impacts of various changes over the life of the Project, ODRA has no record of [Archer] filing such a claim on behalf of its subcontractors."  Final Order at 79.  Cumulative impact claims go by many names, such as "'ripple effect,' 'loss of labor efficiency,' or 'loss of productivity.'" *Jackson Constr. Co. v. United States*, 62 Fed. Cl. 84, 103 (2004).  A cumulative impact claim is "based upon the theory that individual compensable changes to a Contract, taken as a whole, can have such a disruptive effect on the contractor's performance that the contractor has a compensable claim for costs in addition to the amounts of its individual change orders."  62 Fed. Cl. 84, 103-04 (citations omitted).

A cumulative impact claim "is asserted separately from individual compensable changes.  Cumulative impact arises from changes which had such an effect on performance that there is a separately compensable impact claim that does not include the direct costs of the changes."  *Norman Eng'g Co. v. NASA*, No. 1189-12, 92-2 BCA ¶ 24900, 1992 NASA BCA LEXIS 1 (citations omitted).  In *Pittman Construction Co. v. United States*, the United States Claims Court addressed a direct damages claims separately from a cumulative impact claim.  2 Cl. Ct. 211, 216 (1983).  The court explained that the latter involves "the

inefficiencies and disruptions associated with changes which, when viewed

cumulatively (*i.e.*, retrospectively), were so large in number and/or magnitude as to

give rise to a separately compensable impact claim.  The term "ripple effect" has

also been used to describe such impact costs."  *Id.*; *see also McMillin Bros.*

*Constr., Inc. v. Dep't of Energy*, No. 328-10-84, 91-1 BCA ¶ 23351, 1990 EBCA

LEXIS 10, *32 (distinguishing "cost of performing the changed work" from added

costs that are not "attributable to any one change but flows from the synergy of the

number and scope of changes issued on a project").

Thus, contrary to Archer's argument, Pet. Br. at 24, the cumulative impact

claim is a separate claim from those that it asserted in its Notice.  Indeed, Archer

acknowledges elsewhere in its brief that a cumulative impact claim "must be

viewed in hindsight to understand the compensable impact claim, *beyond*

*individual changes or delays*."  Pet. Br. at 29 (emphasis added).

## B.    Archer's Notices Of Contract Dispute Did Not Assert A Cumulative Impact Claim

Archer's cumulative impact claim, as articulated in its post-hearing brief

before ODRA, is based on the theory that "[d]uring the course of construction, G-

K and other Subcontractors . . . were delayed and greatly impacted *by numerous*

*events* beyond the control of the Subcontractors."  Post-Hearing Br. at 40

(emphasis added).  In its post-hearing reply brief, Archer described its claims as

37

arising from "the direct impacts on the Subcontractors' work caused by the *numerous* RFIs, the extended response periods, the *extraordinary number* of Change Orders, and their disruption to the original scope of work." Post-Hearing Reply at 23 (emphasis added).

Archer's 2015 notices of contract disputes include no similar allegations. Indeed, Archer acknowledges that it did not "use the specific phrasing of cumulative impact, disruption, lost productivity or inefficiencies." Pet. Br. at 25. Nor is it surprising that the notices contained no allegations of cumulative impacts. The 2015 notices related to specific aspects of the project: shaftwork, glass panels, ductwork, and other small changes for which Archer claimed it was owed direct costs. A1-0004, -0014, -0015, -0419, -0423. Thus, the notices never asserted claims based on the project as a whole or based on the cumulative effect of the number of contract changes over the course of the entire project. Accordingly, ODRA correctly determined that Archer did not assert the cumulative impact claim in its 2015 notices.

C.    None Of Archer's Arguments Demonstrates That It Filed A Notice With ODRA For The Cumulative Disruption Claim

Archer's attempts to excuse its failure to give timely notice of its cumulative impact claims are all mistaken. *First*, Archer argues that ODRA is not "overly technical" about what will constitute a contract dispute filing, citing *Matter of*

*Contract Dispute of Martin Resnick Construction Co.*, 99-ODRA-00111, 2000 WL 36731263 (June 30, 2000).  Pet. Br. at 24.  In *Resnik*, a contractor filed a document styled as a claim, but because of ongoing alternative dispute resolution efforts relating to a different claim, ODRA did not docket it as separate claim.  *Id.* at *48.  Later, when ODRA did docket the claim, ODRA sought supplemental information from the contractor to satisfy ODRA's then-procedural rules for claims, and the FAA later argued that the claim was untimely.  *Id.*

In this unique context, ODRA stated that it "will not be overly technical about what will qualify as a 'contract dispute' filing under the AMS."  *Id.* (emphasis added).  ODRA further explained, that, "[g]enerally, so long as it is clear—as was the case here—that the contractor wishes the ODRA to process a filing as a 'contract dispute,' the ODRA will accept that a contract dispute has been filed and will proceed on that basis."  *Id.*  Thus, *Resnik* is not on point because the question here is not whether the 2015 notices were in fact contract disputes, but whether they allege facts and a claim for cumulative impact.

*Second*, Archer looks to the pleading requirements under the Federal Rules of Civil Procedure, arguing that under notice pleading, detailed factual allegations are not required and that pleadings need only state a plausible claim for relief on its face.  *See* Pet. Br. at 25, 27.  Those rules, however, are inapposite because ODRA

39

rules expressly require more from a claimant: "[a] *detailed* chronological statement of the facts and of the legal grounds underlying the contract dispute, *broken down by individual* claim item, citing to relevant contract provisions and attaching copies of the contract and other relevant documents." 14 C.F.R. § 17.27(a)(3) (emphasis added). In any event, Archer's problem is not that it alleged too few details about an asserted claim, but that Archer failed to mention a cumulative impact claim and also alleged no *details or facts* about such a claim in its notices.

Next, Archer argues that the FAA's own October 2016 response to the claims constituted the requisite notice to ODRA of a separate claim for cumulative impact damages. Pet. Br. at 28. Archer is confusing the issues. On October 25, 2016, the FAA filed a substantive response and affirmative defenses. *See* Substantive Response and Affirmative Defense, Part 6 at 1. In that filing, the FAA asserted that Archer's "claim regarding inefficiencies/lost productivity/cumulative impact ('inefficiency') was not submitted until January 15, 2016," and was untimely. *Id.* FAA was not addressing a new notice that Archer had filed with ODRA. Moreover, the FAA consistently took the position in its pre-hearing brief that Archer had not filed a notice of contract dispute relating to a cumulative

40

impact claim.  *See* FAA Product Team's Final Submission September 12, 2019, at .pdf pp. 70, 86.

Finally, using circular logic, Archer argues that because it purportedly described the basis for its cumulative impact claim in its notices of contract disputes, "the FAA had ample, actual notice" of its "Disruption" claim and, thus, that FAA must show that it was prejudiced by Archer's less than perfect.  Pet. Br. at 30-31.  As we have established, however, the notices did *not* provide actual notice, thus this argued is flawed.

Moreover, in making this argument, Archer relies on inapposite cases, citing *Engineered Maintenance Services., Inc. v. United States*, 55 Fed. Cl. 637, 641 (2003), *aff'd*, 89 F. App'x 267 (Fed. Cir. 2004); *Csh Contractors, Inc. v. NASA*, No. 476-2, 77-2 BCA ¶ 12814, 1977 NASA BCA LEXIS 4; and *Big Chief Drilling Co. v. United States*, 15 Cl. Ct. 295, 303 (1988).  None of these cases addressed whether a contract dispute claim was timely filed.  Rather, they all involved questions of a contractor's compliance with *notice provisions* in the contract, for example, to notify the agency that there is a differing site condition under FAR 52.236–2.  *See, e.g.*, *Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641.  In that situation, if the agency is otherwise aware of the condition, then the contractor's

failure to comply with the FAR provision will not preclude a claim.  *Id.*  Thus, these cases address a wholly different issue.

The Court should affirm ODRA's order dismissing as untimely any cumulative impact claim.

IV.    ODRA's Finding That The FAA Reasonably Rejected The Rectangular Ductwork Is Supported By Substantial Evidence

ODRA found that "the FAA's rejection of the rectangular duct based on the risk of future delamination was reasonable."  Final Order at 61.  In reaching this conclusion, ODRA considered the evidence both for and against FAA's position, but found that the FAA's rejection was reasonable.

As we demonstrate below, ODRA's decision is supported by substantial evidence.  Archer's argument that the FAA did not establish the rectangular duct was defective reduces to a mere disagreement with ODRA's factual findings—a disagreement that is insufficient to demonstrate any reversible error.  Moreover, Archer is incorrect that the FAA imposed a heightened standard on Archer; the FAA—indeed all the parties—relied on the same, reasonable testing method. Archer has failed to demonstrate any error in ODRA's decision, and the Court should thus affirm.

42

A.    ODRA's Findings Are Supported By Substantial Evidence

The contract required the application of an antimicrobial coating "to the surface of sheet metal that will form the interior surface of the duct."  Final Order at 12; J6-0231-0232.  As even Archer acknowledged, a coating that delaminates does not conform to this requirement because if the coating is falling off, it is not forming the interior surface.  Tr.1331-32.

As a preliminary matter, in finding that the FAA reasonably rejected the rectangular duct, ODRA correctly cited the well-established rule that the Government is entitled to strict compliance with contract specifications.  Final Order at 55.  "The basic rule is that the Government is entitled to strict compliance with the contract requirements.  The rule insures that the thing delivered will satisfy the Government's needs, that public funds will not be improperly expended, etc."  *Caddell Const. Co., Inc. v. GSA*, No. 7991, 91-1 BCA ¶ 23478, 1990 GSBCA LEXIS 654, *13; *see also Granite Constr. Co. v. United States*, 962 F.2d 998, 1006 (Fed. Cir. 1992).

ODRA's reference to this rule is unremarkable, and indeed, Archer admits that it does not dispute that the Government may require strict compliance with contract specifications.  Pet. Br. at 48.  Archer nonetheless suggests that ODRA erred in relying on the rule because ODRA cited cases where there was no dispute

43

that the contractor had failed to meet the contract specifications. *Id.* at 48-49, 52; Final Order at 55 (citing *Caddell Const.*, 1990 GSBCA LEXIS 654, at *13; *Valenzuela Engineering*, *Inc*., No. 53608, 04-1 BCA ¶ 32517, 2004 ASBCA LEXIS 7; and *Sigma Constr. Co, Inc.*, No. 37040, 91-2 BCA ¶ 23926, 1991 ASBCA LEXIS 104). ODRA, however, did not cite the cases for any purpose other than to state the rule, and the facts of the cases do not effect whether, here, the FAA was entitled to strict compliance with the contract specifications. Archer's argument that the cases are distinguishable from the facts here is really just a dispute with ODRA's decision on the merits that the FAA reasonably rejected the rectangular ducts as not conforming to the contract specifications.

Turning to the merits of that decision, substantial evidence supports the conclusion that the FAA reasonably rejected the rectangular duct as non-conforming. Final Order at 61. With its repeated assertions that because the rectangular duct was not flaking, it could not be defective, Pet. Br. at 43, 45, 49, Archer ignores the full picture before ODRA. Unlike Archer's narrow focus, ODRA considered numerous facts consistent with the FAA's decision.

Namely, ODRA recognized that the rectangular duct turning vanes were already delaminating. *Id.* at 58-59. Further, the ASTM D3359 test results for the rectangular ducts indicated that the level of adhesion on the rectangular ducts was

44

similar to that of the round ducts, Final Order at 58 (citing J26-2249-2250; Tr.1309), and it was undisputed that the round ducts were non-compliant due to the flaking and that the round duct delamination was not stabilizing over time. Final Order at 56.

Additionally, the duct manufacturer (Bio Shield), a consultant that Archer had hired (RTI), and the FAA's consultant (Mr. Neff) all concluded that oil on the duct surface was a contributing factor to the catastrophic delamination of the round duct, and oil was also found on the surface of the rectangular duct, albeit in lower amounts. Final Order at 25. Also, the rectangular duct was manufactured by the same fabricator as the defective, round duct and at the same facility as the defective, round duct. Final Order at 61. All this evidence supports the FAA's conclusion that the rectangular duct was at risk of performing like the round duct— that is, it would delaminate.

Moreover, ODRA also considered the parties' competing expert opinions. The FAA's expert reviewed samples and opined that given the presence of oil on the rectangular duct, it was likely that the rectangular duct would experience adhesion failures in the future. Final Order at 60. Archer's expert testified that he observed peeling of the turning vanes in the rectangular ducts, but proposed that rather than using the ASTM D3359 test, an air erosion test would be a more

45

accurate test. *Id.* at 59. ODRA recognized, however, that Archer and G-K both earlier had relied on the ASTM test, which was also cited by Bio Shield, the duct manufacturer. *Id.* at 60. Although Archer argues that the ASTM D3359 test was too rigorous, Pet. Br. at 51, ODRA considered, but rejected, the testimony of Archer's expert to that effect because Archer (through its consultant SME) and G-K's own consultants (Bio Shield, SME, and RTI) had used the test. Final Order at 58.

Ultimately, overall, ODRA found the FAA's expert "more persuasive" than Archer's testifying expert. Final Order at 60. ODRA also found that Archer's testifying expert used a misleading, watered-down version of an "air erosion" test, rendering the test irrelevant to measuring the adhesion strength of the coating in the presence of oil, over time. *Id.* at 60 n.34.

Archer suggests that the FAA's expert did not actually support the FAA's position, citing the FAA expert's opinions and hearing testimony. Pet. Br. at 39-41. Archer is wrong. As ODRA concluded, "Mr. Neff made findings in a report that were consistent with the concerns expressed by the FAA in support of its decision to reject the rectangular duct." Final Order at 60 & n.34. Ultimately, Archer is merely quarrelling with ODRA's highly discretionary determination that one expert is more credible than the other. It is well-established that where there is

46

conflicting expert testimony, the Court defers to the trier of fact's reasonable

determination regarding "not only the relevance but the reliability of expert

testimony presented at trial." *Sec'y of Lab. v. Keystone Coal Min. Corp.*, 151 F.3d

1096, 1107 (D.C. Cir. 1998) (citations omitted).

 Given all the contemporaneous testing and analysis that is consistent with

the FAA's decision, coupled with the opinion of the FAA's expert, substantial

evidence supports ODRA's conclusion "that the information available to the FAA

supported its concerns that the rectangular duct could delaminate in the future in a

manner similar to the round duct." Final Order at 61. Archer's repeated references

to the fact that the rectangular ducts were not delaminating (which is not correct in

any event), *e.g.*, Pet. Br. at 36, 42, 46, 50; to testimony indicating that some FAA

individuals at various times may not have considered removal of the rectangular

ducts necessary, Pet. Br. at 37; and to its own expert's opinions, Pet. Br. at 38-39,

are at best, an "alternative interpretation of the evidence" that could "support a

contrary view." *Western Air Lines*, 495 F.2d at 152. This, however, fails to

demonstrate that ODRA's decision lacked substantial evidentiary support.

*Western Air Lines*, 495 F.2d at 152; *Jones*, 225 F.3d at 765. As such, Archer

presents no basis for the Court to disturb ODRA's findings.

47

B.    The FAA Did Not Impose An Extra-Contractual Adhesion Standard
      Requirement

Archer's complaint about the FAA's decision largely turns on the theory that

the FAA required Archer to comply with an adhesion standard that was not

contained in the contract.  Pet. Br. at 43-52.  Specifically, Archer argues that the

ASTM D3359 testing was not required by the contract, and that because the FAA

considered the results of the ASTM D3359 testing, the FAA required Archer to

meet a higher standard than required in the contract.  Pet. Br. at 43, 47.[14]  As we

demonstrate below, however, the FAA imposed no extra-contractual requirement.

Although the contract did not include a specific adhesion level or testing

methodology, the contract did require the application of an antimicrobial coating

"to the surface of sheet metal *that will form the interior surface of the duct*."  J6-

0231-0232 (emphasis added).  Simply put, if the coating flakes, it is not forming

the interior surface, and it is non-conforming.  Given the undisputed, catastrophic

failure of the round duct to meet that requirement; the delamination in the

rectangular duct turning vanes; the presence of oil in both the round and

rectangular duct; and that the round and rectangular duct were manufactured in the

_____

[14] *See also* Pet. Br. at 47-48 (arguing that ODRA erred by relying on cases
where the contract included "the test to determine whether the contract
specifications had been complied with").

48

same facility, the FAA and ODRA reasonably relied on the ASTM D3359 test results as one factor in determining whether the rectangular duct was defective.

To ensure strict compliance with contract specifications, the Government has a right "to conduct reasonable tests to determine if a product meets such requirements even though the particular test employed, or some detail thereof, is not spelled out in the contract." *Standard-Thomson Corp*., No. 15772, 72-1 BCA ¶ 9220, 1971 ASBCA LEXIS 113, *11. The cases that Archer cites, *Nash Metalware, Co., Inc*. and *Lowell Monument Co.*, articulate the same rule.[15] Pet. Br. at 51-52 (quoting *Nash Metalware Co., Inc. v. GSA*, No. 11951, 94-2 BCA ¶ 26780, 1994 GSBCA LEXIS 98; *Lowell Monument Co. v. Dep't of Veterans Affairs*, No. 1191, 77-1 BCA ¶ 12439, 1977 VA BCA LEXIS 12). These decisions recognize that when a contract does not include a method for determining compliance, "an inspection method is acceptable as a basis for rejection if it is accurate and reasonably calculated to determine compliance with the specification." *Nash Metalware*, 1994 GSBCA LEXIS 98, at *21. "The Government is entitled to use whatever test it chooses to determine contract

---

[15] Oddly, Archer contends that ODRA should not have relied on these cases because they purportedly involved testing that was specified in the contract. Pet. Br. at 47-48. But as Archer's quotations from these cases demonstrate, the cases did not involve contract provisions that specified the testing. *Id.* at 51-52.

49

compliance so long as it does not impose a higher standard than that included in the contract. *Id.*; *see also Lowell Monument*, 1977 VA BCA LEXIS 12 , at *20 ("Inspection methods and tests not called for by the contract are acceptable as a basis for the rejection of a product where the tests are accurate and reasonably calculated to determine compliance with the specifications and have, in fact, revealed noncompliance.").

Thus, the question is whether it was reasonable for the FAA to rely on the test given that the contract contained no adhesion standard. It was. The ASTM test was the very standard that Bio Shield, the coating manufacturer itself, identified in its literature, stating that the coating rated as a 5B under the test. Final Order at 17. Also, ODRA found compelling that although "the ASTM D 3359 test method was not specified in the contract," all parties had relied on the ASTM D3359 test prior to the litigation. Final Order at 58; Tr.1363-1364; F2-2093. Indeed, G-K said the test is effective as "an indicator of adhesion," Tr.1042. Archer's expert acknowledged that the tape test results can provide "relative comparisons of adhesion strength." A3-0040; Final Order at 58. The FAA's expert also opined that using the ASTM D3359 test to evaluate the duct was "valid and appropriate in order to assess the contamination generation risk of these coatings." F9-0005.

50

Thus, the FAA's reliance on the ASTM test is consistent with the rule that "in the absence of a contract specification … industry standards [can] be used." *Hogan Constr., Inc.*, Nos. 38801, 39014, 90-3 BCA ¶ 22969, 1990 ASBCA LEXIS 193, **4 (in the absence of a contract specification for mortar to be used in a concrete masonry wall, a mortar meeting industry standards was to be used); *see also In Matter of Appeal of Custom Printing Co.*, GPOBCA No. 28-94, 1997 WL 128720 (Mar. 12, 1997) ("In that regard, any test which conforms to generally accepted industry practice is usually considered reasonable.").

Archer also challenges the use of the ASTM D3359 test because it had no pass/fail standard, implying that the test results are meaningless.  Pet. Br. at 46. The absence of a pass/fail standard does not mean that ODRA could not, as a fact finder, interpret the tests results as showing a likelihood of future failure.  Notably, Archer ignores ODRA's finding that the test revealed that the adhesion levels of the rectangular duct were similar levels to those in the round duct, which was undisputedly failing on a catastrophic level.  Final Order at 57.  Regardless of the particular rating on the scale of zero to five, the ASTM D3359 test results provided a reasonable way to compare the adhesion levels of the rectangular duct with the adhesion levels of the failing round duct.

51

Archer's complaint that the test had no pass/fail standard is also at odds

with, as ODRA explained, the position of "G-K's own testing consultant, SME,

[that] nearly all of the adhesion ratings for the rectangular duct samples were at

odds with a 5B rating promised in the [Bio Shield] Specifications."  Final Order at

61.  Likewise, as cited by ODRA, G-K recognized internally that 34 percent of the

rectangular ducts would fail if one assumes that a zero to three result meant failure.

Final Order at 61 (citing F2-2093).  More specifically, G-K wrote:

> [I] have taken the second round of SME testing and
> figured out percentages.
>
> Being the scale is from 0 to 5 (0 being bad and 5 being
> perfect) I split it down the middle, 0 thru 2 as failed and 3
> thru 5 as passed.  *Remember that there really isn't a pass
> or fail criteria but I had to draw a line somewhere.*

F2-2093 (emphasis added).  Given the rating scale of zero to five, drawing the line

at three is reasonable and consistent with the parties' own views of the ASTM

D3359 test results when the FAA rejected the rectangular duct.  *See* Final Order at

57-58 (citing Tr.1047-1048 and explaining that G-K and the FAA reached similar

conclusions).

Archer suggests that instead of the ASTM D3359 test, visual inspection was

the "proper test" for determining if the coating was defective, citing an FAA email.

Pet Br. at 35 (citing A4-0126).  The FAA email actually states, "Any letter should

emphasize the flakes produced and not rely on the ATM [sic] test results.  The ASTM test I do not believe is a contract requirement *and as such is a useful guide*."  A4-0126 (emphasis added).  Thus, although the FAA recognized that the ASTM D3359 test was not a contract requirement, the FAA considered the test to nonetheless be a useful guide given that the round duct and the turning vanes were already flaking.

Archer also implies that the FAA itself agreed that it was applying a test beyond the contract requirements, citing hearing testimony of the contracting officer.  Pet. Br. at 37 (citing Tr.1351).  The testimony shows otherwise.  The contracting officer testified that the FAA rejected the rectangular ducts as non-conforming based a number of factors, including "adherence based on the ASTM tests;" the fact that within a month of turning the HVAC system on, the round duct had visually "failed so greatly;" and the fact that the same firm applied the coating to both the round and the rectangular ductwork.  Tr.1350-51.  In this context, the contracting officer then answered "yes" to the question, "so you rejected the rectangular duct based on the ASTM testing, right?"  Tr.1351.  The contracting officer emphasized again that the FAA rejected the rectangular ducts based on the testing in conjunction with other factors.  Tr.1371-72; *see* also Tr.1324

53

Finally, Archer argues that because the FAA referred to whether the coating would adhere for the "life of the facility," FAA was imposing a new contract requirement because Archer was contractually obligated to only a two-year warranty.  Pet. Br. at 47.  Archer implies that the coating need only last two years, since that was the overall project warranty period.  Pet. Br. at 47.  Archer ignores, however, that even G-K focused on adhesion over "the long term."  Final Order at 26 (citing F2-2091).  In addition, the FAA's comment is fully consistent with the ASTM D3359 statement that "[i]f a coating is to fulfill its function of protecting or decorating a substrate, it must adhere *for the expected service life*."  J26-1781 (emphasis added).

Ultimately, ODRA found that the FAA's rejection of the rectangular duct was reasonable not solely because of the ASTM adhesion test results or because the coating would not last a specific period of time, but because as a whole, "the information available to the FAA supported its concerns that the rectangular duct could delaminate in the future in a manner similar to the round duct."  Final Order at 61.  ODRA's decision was supported by substantial evidence and did not hold Archer to any extra-contractual requirements.  Accordingly, the Court should affirm.

54

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny Archer's

petition and affirm the FAA's Final Order.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

/s/ Patricia M. McCarthy
PATRICIA M. MCCARTHY
Assistant Director

/s/ Corinne A. Niosi
CORINNE A. NIOSI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0391
Email: Corinne.A.Niosi@usdoj.gov

August 10, 2021                Attorneys for Respondents

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE
## <u>REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 12,199 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). In making this certification, I have relied upon the word count function in Microsoft Word.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 10 in Times New Roman, 14- point font.

<u>/s/Corinne A. Niosi</u>
CORINNE A. NIOSI
Senior Trial Counsel
Commercial Litigation Branch
August 10, 2021                         Civil Division

## <u>CERTIFICATE OF SERVICE</u>

I certify under penalty of perjury that on the 10th day of August, 2021, I

caused to be served on all parties by operation of the Court's Case

Management/Electronic Filing (CM/ECF) system the foregoing "BRIEF FOR

RESPONDENTS."

<u>/s/ Corinne A. Niosi</u>
CORINNE A. NIOSI
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice

57

# **<u>ADDENDUM</u>**

# <u>ADDENDUM TABLE OF CONTENTS</u>

**Statutes**

41 U.S.C. § 3301 ................................................................................................1

41 U.S.C. § 7103(a) ...........................................................................................2

49 U.S.C. § 40110(d)(1)-(2), (4)........................................................................3

49 U.S.C. § 46110(c) .........................................................................................4

**Regulations**

14 C.F.R. § 17.3(a), (b), (h), (t) ........................................................................5

14 C.F.R. § 17.33(l) ...........................................................................................6

14 C.F.R. § 17.41 ...............................................................................................6

FAR § 33.201 .....................................................................................................6

FAR 52.236–2 ....................................................................................................7

## 41 U.S.C. § 3301

### § 3301 Full and open competition

(a)  In General.—Except as provided in sections 3303, 3304(a), and 3305 of this title and except in the case of procurement procedures otherwise expressly authorized by statute, an executive agency in conducting a procurement for property or services shall—

> (1)  obtain full and open competition through the use of competitive procedures in accordance with the requirements of this division and the Federal Acquisition Regulation; and

> (2) use the competitive procedure or combination of competitive procedures that is best suited under the circumstances of the procurement.

(b)  Appropriate Competitive Procedures.—

(1)   Use of sealed bids.—In determining the competitive procedures appropriate under the circumstance, an executive agency shall—

(A)  solicit sealed bids if—

> (i)  time permits the solicitation, submission, and evaluation of sealed bids;

> (ii)  the award will be made on the basis of price and other price-related factors;

> (iii)  it is not necessary to conduct discussions with the responding sources about their bids; and

> (iv) there is a reasonable expectation of receiving more than one sealed bid; or

(B)  request competitive proposals if sealed bids are not appropriate under subparagraph (A).

(2)  Sealed bid not required.—

Paragraph (1)(A) does not require the use of sealed-bid procedures in cases in which section 204(e) [1] of title 23 applies.

1

(c)  Efficient Fulfillment of Government Requirements.—
The Federal Acquisition Regulation shall ensure that the requirement to obtain full and open competition is implemented in a manner that is consistent with the need to efficiently fulfill the Federal Government's requirements.


## 41 U.S.C. § 7103

### § 7103 Decision by contracting officer

(a) Claims generally.--

    (1) Submission of contractor's claims to contracting officer.--Each claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision.

    (2) Contractor's claims in writing.--Each claim by a contractor against the Federal Government relating to a contract shall be in writing.

    (3) Contracting officer to decide Federal Government's claims.--Each claim by the Federal Government against a contractor relating to a contract shall be the subject of a written decision by the contracting officer.

    (4) Time for submitting claims.--

        (A) In general.--Each claim by a contractor against the Federal Government relating to a contract and each claim by the Federal Government against a contractor relating to a contract shall be submitted within 6 years after the accrual of the claim.

        (B) Exception.--Subparagraph (A) of this paragraph does not apply to a claim by the Federal Government against a contractor that is based on a claim by the contractor involving fraud.

(5) Applicability.--The authority of this subsection and subsections (c)(1), (d), and (e) does not extend to a claim or dispute for penalties or forfeitures prescribed by statute or regulation that another Federal agency is specifically authorized to administer, settle, or determine.

## 49 U.S.C.A. § 40110(d)(1)-(2), (4)

### § 40110. General procurement authority

(d) Acquisition management system.--

(1) In general.--In consultation with such non-governmental experts in acquisition management systems as the Administrator may employ, and notwithstanding provisions of Federal acquisition law, the Administrator shall develop and implement an acquisition management system for the Administration that addresses the unique needs of the agency and, at a minimum, provides for--

(A) more timely and cost-effective acquisitions of equipment, services, property, and materials; and

(B) the resolution of bid protests and contract disputes related thereto, using consensual alternative dispute resolution techniques to the maximum extent practicable.

(2) Applicability of Federal acquisition law.--The following provisions of Federal acquisition law shall not apply to the new acquisition management system developed and implemented pursuant to paragraph (1):

(A) Division C (except sections 3302, 3501(b), 3509, 3906, 4710, and 4711) of subtitle I of title 41.

(B) Division B (except sections 1704 and 2303) of subtitle I of title 41.

(C) The Federal Acquisition Streamlining Act of 1994 (Public Law 103-355). However, section 4705 of title 41 shall apply to the new acquisition management system developed and implemented pursuant to paragraph (1). For the purpose of applying section 4705 of title 41 to the system, the term "executive agency" is deemed to refer to the Federal Aviation Administration.

3

(D) The Small Business Act (15 U.S.C. 631 et seq.), except that all reasonable opportunities to be awarded contracts shall be provided to small business concerns and small business concerns owned and controlled by socially and economically disadvantaged individuals.

(E) The Competition in Contracting Act.

(F) Subchapter V of chapter 35 of title 31, relating to the procurement protest system.

(G) The Federal Acquisition Regulation and any laws not listed in subparagraphs (A) through (F) providing authority to promulgate regulations in the Federal Acquisition Regulation.

***

(4) Adjudication of certain bid protests and contract disputes.--A bid protest or contract dispute that is not addressed or resolved through alternative dispute resolution shall be adjudicated by the Administrator through Dispute Resolution Officers or Special Masters of the Federal Aviation Administration Office of Dispute Resolution for Acquisition, acting pursuant to sections 46102, 46104, 46105, 46106 and 46107 and shall be subject to judicial review under section 46110 and to section 504 of title 5.

## 49 U.S.C. § 46110(c)

## § 46110 - Judicial review

(c) AUTHORITY OF COURT.—When the petition is sent to the Secretary, Under Secretary, or Administrator, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Under Secretary, or Administrator to conduct further proceedings. After reasonable notice to the Secretary, Under Secretary, or Administrator, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Under Secretary, or Administrator, if supported by substantial evidence, are conclusive.

## 14 C.F.R. § 17.3(a), (b), (h), (t)

### § 17.3 - Definitions

(a) Accrual means to come into existence as a legally enforceable claim.

(b) Accrual of a contract claim means that all events relating to a claim have occurred, which fix liability of either the government or the contractor and permit assertion of the claim, regardless of when the claimant actually discovered those events. For liability to be fixed, some injury must have occurred. Monetary damages need not have been incurred, but if the claim is for money, such damages must be capable of reasonable estimation. The accrual of a claim or the running of the limitations period may be tolled on equitable grounds, including but not limited to active concealment, fraud, or if the facts were inherently unknowable.

\*\*\*

(h) Contract Dispute, as used in this part, means a written request to the ODRA seeking, as a matter of right under an FAA contract subject to the AMS, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or for other relief arising under, relating to, or involving an alleged breach of that contract. A contract dispute does not require, as a prerequisite, the issuance of a Contracting Officer final decision. Contract disputes, for purposes of ADR only, may also involve contracts not subject to the AMS.

\*\*\*

(t) Product Team, as used in these rules, refers to the FAA organization(s) responsible for the procurement or contracting activity, without regard to funding source, and includes the Contracting Officer (CO). The Product Team, acting through assigned FAA counsel, is responsible for all communications with and submissions to the ODRA in pending matters.

## 14 C.F.R. § 17.33(l)

### § 17. 33 Adjudicative Process for contract disputes

(l) The DRO or Special Master shall prepare findings and recommendations, which will contain findings of fact, application of the principles of the AMS and other law or authority applicable to the findings of fact, and a recommendation for a final FAA order.

## 14 C.F.R. § 17.41

### § 17.41 Final orders

All final FAA orders regarding protests or contract disputes under this part are to be issued by the FAA Administrator or by a delegee of the Administrator.

## FAR 33.201

### §33.201 Definitions.

As used in this subpart-

Accrual of a claim means the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known. For liability to be fixed, some injury must have occurred. However, monetary damages need not have been incurred.

## FAR 52.236-2

**52.236-2 Differing Site Conditions.**

As prescribed in 36.502 insert the following clause:

Differing Site Conditions (Apr 1984)

(a) The Contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of-

(1) Subsurface or latent physical conditions at the site which differ materially from those indicated in this contract; or

(2) Unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract.

(b) The Contracting Officer shall investigate the site conditions promptly after receiving the notice. If the conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the work under this contract, whether or not changed as a result of the conditions, an equitable adjustment shall be made under this clause and the contract modified in writing accordingly.

(c) No request by the Contractor for an equitable adjustment to the contract under this clause shall be allowed, unless the Contractor has given the written notice required; provided, that the time prescribed in paragraph (a) of this clause for giving written notice may be extended by the Contracting Officer.

(d) No request by the Contractor for an equitable adjustment to the contract for differing site conditions shall be allowed if made after final payment under this contract.